**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Federal Deposit Insurance Corporation as
Receiver for Washington Mutual Bank,

     Plaintiff

v.

Nevada Title Company,

     Defendant

2:14-cv-01567-JAD-GWF

**Order Denying Cross-Motions for Summary Judgment**

[ECF Nos. 41, 42]

     The Federal Deposit Insurance Company (FDIC), as receiver for Washington Mutual Bank (WAMU), sues Nevada Title Company for allegedly breaching closing instructions that lender WAMU issued for a home sale in 2007.[1]  The parties cross-move for summary judgment. The FDIC argues that it is entitled to judgment in its favor on all elements of its breach-of-contract claim, except for the amount of damages.[2]  Nevada Title argues that judgment should be entered in its favor because the FDIC cannot establish causation or damages.[3]  Nevada Title also objects to several items of evidence relied on by the FDIC and asks me to take judicial notice of numerous documents that it contends are public records.

     I find that the records identified by Nevada Title are judicially noticeable and I grant its request for judicial notice in part: I take judicial notice of the documents' authenticity, publication, and existence, but I do not take notice of the truth of their content.  I overrule all of Nevada Title's evidentiary objections.  Because I find that facts material to the FDIC's breach-of-contract claim remain genuinely disputed, I deny the parties' cross-motions for summary judgment.  And I refer this case to the magistrate judge for a mandatory settlement conference.

---

[1] ECF No. 1.

[2] ECF No. 41.

[3] ECF No. 42.

**Background**

Mitchell Udy financed his purchase of 1590 Villa Rica Drive in Henderson, Nevada, with a $4,280,000 loan from WAMU.[4]  Mitchell testified in deposition that his father Ronald Dean Udy used Mitchell's name and credit to purchase the property.[5]  Ronald and Mitchell's brother, Cameron Udy, both pleaded guilty to conspiracy to commit bank fraud in connection with this transaction.[6]  None of the Udys is a party to this action.

Nevada Title acted as the closing agent on the transaction under instructions issued by WAMU.[7]  Nikki Sikalis-Bott was Nevada Title's escrow officer who handled the transaction.[8]  The closing instructions state that WAMU's loan to Mitchell is subject to the Real Estate Settlement Procedures Act (RESPA).[9]  As the "Settlement Agent," Nevada Title was "responsible for delivering the completed RESP Settlement Statement–HUD-1 Form in accordance with the requirements of the [RESPA], and . . . a condition of [WAMU's] consent to [Nevada Title] closing this transaction is that [Nevada Title] accept these instructions and complete and deliver the HUD-1 Statement in accordance with such requirements."[10]  Nevada Title submitted an estimated HUD-1 statement for WAMU's review on March 30, 2007, and, on that basis, WAMU authorized Nevada Title to close the transaction and disburse the loan proceeds.[11]

---

[4] ECF No. 41-1 at 27.

[5] ECF No. 41-3 at 11 (34:3–35:21 of the transcript).

[6] ECF No. 41-1 at 2–9, 34–41, 43–49.

[7] *Id.* at 11.

[8] *Id.* at 11, ¶¶ 3–4.

[9] *Id.* at 17.

[10] *Id.*

[11] *Id.* at 11–12.

1   After it prepared the estimated HUD-1 statement, Nevada Title received information that

2   $1.2 million of the seller's proceeds was to go to three recipients who were not included on the

3   estimated statement: Credit Associates, Terry Wood, and Brasameri.[12]  Nevada Title did not

4   inform WAMU of this change, but instead completed the transaction and disbursed (1) $300,000

5   to a bank account associated with Credit Associates; (3) $650,000 to a bank account associated

6   with Terry Wood; and (4) $250,000 to a bank account associated with Brasameri.[13]  After the

7   transaction closed and the loan funds had been disbursed, Nevada Title provided WAMU with a

8   final HUD-1 settlement statement disclosing that it paid a $1.2 million "[c]ommission to Credit

9   Associates."[14]

10   A year and a half after the transaction was complete, the Office of Thrift Supervision

11   closed WAMU and appointed the FDIC as its receiver.[15]  That same day, the FDIC sold

12   substantially all of WAMU's assets to JPMorgan Chase Bank, N.A.[16]  The sale included

13   WAMU's loan to Mitchell for the 1590 Villa Rica property, which JPMorgan bought for "Book

14   Value."[17]  The FDIC sues Nevada Title for breaching WAMU's closing instructions, and I now

15   address the parties' cross-motions for summary judgment.

16   **Discussion**

17   **A.    Nevada Title's request for judicial notice**

18   My analysis begins with Nevada Title's request that I take judicial notice of 19

19   documents that it contends are matters of public record.[18]  Rule 201 of the Federal Rules of

20

21   [12] *Id.* at 12.

22   [13] *Id.*

23   [14] *Id.* at 12–13.

24   [15] ECF No. 1 at ¶ 2.

25

26   [16] ECF No. 42-3 at 6–45.

27   [17] *Id.* at 41.

28   [18] ECF No. 42 at 18–19.

Evidence allows federal courts to take judicial notice of "matters of public record."[19] Judicial notice is a means to establish the existence of a fact without the necessity of formal proof.[20] "But a court may not take judicial notice of a *fact* that is 'subject to reasonable dispute.'"[21] Thus, a court may take judicial notice of complaints and briefs filed in another case to determine what issues were before that court and were actually litigated.[22] However, it "may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it."[23] "[W]hen a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'"[24]

The documents identified by Nevada Title are judicially noticeable records—they consist of publicly recorded documents like sale-settlement agreements and grant deeds and court filings like complaints, discovery responses, orders, and settlement agreements entered in other cases that the FDIC has pursued in its capacity as WAMU's receiver.[25] But these documents are judicially noticeable only for the purposes of authenticity, publication, and the existence of their

---

[19] *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), *impliedly overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002) (quotation marks and reference omitted).

[20] *Castillo-Villagra v. I.N.S.*, 972 F.2d 1017, 1026 (9th Cir. 1992).

[21] *Lee*, 250 F.3d at 689 (quoting FED. R. EVID. 201(b)).

[22] *Reyn's Pasta Bella, LLC v. Vista USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

[23] *M/V Am. Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983).

[24] *Lee*, 250 F.3d at 690 (quoting *So. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426–27 (3d Cir. 1999)).

[25] ECF No. 42 at 18–19.

content, not for the truth of disputed matters within them.[26]  Accordingly, I take judicial notice of the authenticity, publication, and existence of the 19 documents identified by Nevada Title, but not the truth of their content.

**B.    Nevada Title's evidentiary objections**

Nevada Title objects to ten items of evidence that the FDIC provides to support its motion for summary judgment.[27]  The objected-to evidence falls into four categories: (1) court filings from Ronald Udy's and Cameron Udy's criminal proceedings; (2) deposition transcripts; (3) the declaration of a percipient witness; and (4) a document produced in discovery.[28]  Nevada Title provided no authority or argument for several of its objections and only bald authority for the rest.[29]  The FDIC did not reply to any of Nevada Title's objections.[30]  I address Nevada Title's objections despite these deficiencies.

The first category consists of a criminal indictment and judgments entered against Ronald Udy and Cameron Udy in Case 2:10-cr-290-RLH-PAL (D. Nev. June 16, 2010).[31]  Nevada Title objects that this evidence is not properly authenticated or relevant and is hearsay.  This evidence is judicially noticeable under FRE 201 and I take notice of its authenticity, publication, and existence.  It appears from the limited argument before me that this evidence might be relevant to

---

[26] *U.S. v. So. Cal. Edison Co.*, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) (collecting authorities) ("[w]hile the authenticity and existence of a particular order, motion, pleading[,] or judicial proceeding [that] is a matter of public record [ ] is judicially noticeable, veracity and validity of its contents (the underlying arguments made by the parties, disputed facts, and conclusions of applicable facts or law) are not").

[27] ECF No. 48 at 10–11.

[28] *See id.*

[29] *See generally* ECF No. 48.

[30] *See generally* ECF No. 50.

[31] ECF No. 41-1 at 2–9 (indictment), 34–41 (criminal judgment against Ronald Udy), 43–49 (criminal judgment against Cameron Udy).

the FDIC's theory of breach and causation.[32]  The indictment is not hearsay because the FDIC does not offer it to prove the truth of the matters asserted in it.[33]  And the judgments appear to meet FRE 803's judgment-of-previous-conviction exception to the hearsay rule.[34]  Thus, I overrule Nevada Title's objections to this evidence.

The second category consists of transcripts of the depositions of Cameron Udy, Rebecca Soto, and Mitchell Udy.[35]  Nevada Title objects that this evidence has not been properly authenticated because the reporter's certificates are not signed.[36]  The FDIC has provided me with the complete transcript for each, which includes the court reporter's name, company of employment, and that company's address, a cover page identifying that the deposition was taken as part of this case, and pages providing the date and location of the deposition and the names and affiliations of all attendees (including counsel for Nevada Title).  I find that there is sufficient indicia that this testamentary evidence can be presented in an admissible form at trial.[37]  I therefore overrule Nevada Title's objections.

---

[32] See FED. R. EVID. 401 (providing that evidence is relevant where it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action").

[33] See FED. R. EVID. 801(c) (defining hearsay as a "statement that . . . the declarant does not make while testifying at the current trial or hearing" and "a party offers in evidence to prove the truth of the matter asserted in the statement").

[34] FED. R. EVID. 803(22).

[35] ECF No. 41-1 at 51–106 (Cameron Udy); ECF 41-2 at 2–52 (Rebecca Soto); ECF No. 41-3 at 2–34 (Mitchell Udy).

[36] ECF No. 48 at 10–11.

[37] See FED. R. CIV. PROC. 56(c)(2) (the advisory committee Notes for the 2010 amendment provide that "the burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated").

The third category is the declaration of percipient witness Doug Chalmers.[38]  Nevada Title objects to this evidence on the ground that it was not produced in discovery.[39]  The U.S. District Court for the Northern District of California encountered a similar dispute in *Intel Corp. v. VIA Tech., Inc.* over the sworn statement that a former Intel employee gave to VIA's counsel.[40] The *Intel* court identified three independent reasons why VIA was not required to produce the declaration in discovery: (1) although written, the declaration was not the type of "document" contemplated by FRCP 26(a)(1)(B); (2) the declaration "was clearly work product right up until the moment it was filed"; and (3) the employee was timely disclosed as a fact witness and "VIA in no way tried to obstruct access to the witness."[41]

I am persuaded by the *Intel* court's rationale and I adopt its reasoning.  Nevada Title has not convinced me that this is the unusual instance where a declaration should be considered a "document" within the meaning of FRCP 26.  It also has not demonstrated that the declaration was not the work product of the FDIC's counsel up until the moment it was filed.  Nor does it argue that the FDIC failed to timely disclose this witness or tried to obstruct Nevada Title's access to him.  Accordingly, I overrule Nevada Title's objection.

That leaves the fourth category of evidence, which is a document entitled "Attention Settlement Agent" that appears to have been signed by escrow officer Nikki Bott on April 1, 2007, as the settlement agent for Nevada Title.[42]  Nevada Title objects that this document is not authenticated and is hearsay.[43]  Like the deposition transcripts, there is sufficient indicia that this documentary evidence can be provided in an admissible form at trial as it appears to have been

---

[38] ECF No. 48 at 11.

[39] *Id.*

[40] *Intel Corp. v. VIA Tech., Inc.*, 204 F.R.D. 450 (N.D. Cal. 2001).

[41] *Id.* at 424–25.

[42] ECF 41-1 at 32.

[43] ECF No. 48 at 10.

signed and dated by a key witness who has been deposed in this case.  It is also an opposing

party's statement, thus, not hearsay.[44]  I therefore overrule both of Nevada Title's objections to

this evidence.

## C.    Summary judgment standard

"[W]hen parties submit cross-motions for summary judgment, '[e]ach motion must be

considered on its own merits.'"[45]  Summary judgment is appropriate when, viewing the evidence

"in the light most favorable to the nonmoving party," there is no genuine dispute as to any

material fact.[46]  The moving party "bears the initial responsibility of informing the district court

of the basis for its motion[ ] and identifying those portions of 'the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,' [that] it

believes demonstrate the absence of a genuine issue of material fact."[47]  An issue is "genuine" if

the evidence would permit a reasonable jury to return a verdict for the nonmoving party.[48]  A fact

is "material" if it could affect the outcome of the case.[49]

"[W]hat is required to defeat summary judgment is simply evidence 'such that a

reasonable juror drawing all inferences in favor of the [nonmoving party] could return a verdict

in the [nonmoving party's] favor.'"[50]  "[W]here evidence is genuinely disputed on a particular

---

[44] FED. R. EVID. 801(d)(2).

[45] *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (alteration in original) (quoting W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 499 (Feb. 1992)).

[46] *Jones v. Williams*, 791 F.3d 1023, 1030 (9th Cir. 2015) (quotation marks omitted); FED. R. CIV. PROC. 56(a).

[47] *Celotex Corp. v. Catarett*, 477 U.S. 317, 323 (1986).

[48] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[49] *Id.* at 248.

[50] *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 2017 WL 710476, at *3 (9th Cir. Feb. 23, 2017) (quoting *Reza v. Pearce*, 806 F.3d 497, 505 (9th Cir. 2015)).

issue—such as by conflicting testimony—that 'issue is inappropriate for resolution on summary judgment.'"[51]  But "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial,' and summary judgment is appropriate."[52]

**D.    Applying the summary-judgment standards to the parties' cross-motions**

To prove its breach-of-contract claim, the FDIC must establish that: (1) a valid contractual relationship existed between WAMU and Nevada Title; (2) Nevada Title materially breached a duty that it owed to WAMU under the agreement; and (3) the breach caused WAMU to suffer damages.[53]  The parties do not dispute that the lender's closing instructions constitute a valid agreement between WAMU and Nevada Title, and no party moves for judgment on the damage amount.  The parties instead filed competing motions on causation, Nevada Title moves for judgment on the damage element, and the FDIC moves for judgment on the breach element.  I address the parties' arguments in order.

**1.    Causation**

*a.    Nevada uses a but-for test for breach-of-contract causation.*

The Nevada Supreme Court confirmed that, "[s]imilar to tort claims, causation is an essential element of a claim for breach of contract."[54]  The parties disagree about what test should apply to determine causation in a breach-of-contract case like this one.  The FDIC advocates for the substantial-factor test, which requires it to demonstrate that Nevada Title's breaches of the closing instructions "were a substantial factor in causing [WAMU's] considerable damages."[55]

---

[51] *Id.* (quoting *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1067 (9th Cir. 2016)).

[52] *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

[53] *Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev. 1987) (quoting *Malone v. Uni. of Kan. Med. Ctr.*, 552 P.2d 885, 888 (Kan. 1976)); *Clark County School Dist. v. Richardson Const., Inc.*, 168 P.3d 87, 96 (Nev. 2007).

[54] *Clark Cty. School Dist.*, 168 P.3d at 96.

[55] ECF No. 41 at 12.

Nevada Title argues for the but-for test, which requires the FDIC to demonstrate that WAMU would not have been damaged but for Nevada Title's breaches.[56]

The Nevada Supreme Court explained in *Clark County School District v. Richardson Construction, Inc.* that "'[i]f the damage of which the promisee complains would not have been avoided by the promisor's not breaking his promise, the breach cannot give rise to damages.'"[57] This is a but-for test. The FDIC supports its argument for the substantial-factor test with California caselaw,[58] Nevada caselaw discussing causation in the context of tort claims,[59] and a Nevada jury instruction that applies in negligence actions.[60] The FDIC's authorities are either off-topic or are non-binding and do not persuade me that the Nevada Supreme Court would supplant its stated but-for test with a version of tort law's substantial-factor test in this context. I therefore find that the FDIC must demonstrate that, but for Nevada Title breaching its promise, WAMU would not have suffered the damages complained of by the FDIC.

> **b.    Nevada Title is not entitled to summary judgment due to the lack of evidence to establish causation under the proper test.**

Despite arguing for the wrong test, the record reflects that the FDIC has, just barely, established that the issue of causation is genuinely disputed. Nevada Title asked the FDIC if it

---

[56] ECF No. 42 at 20.

[57] *Clark Cty. School Dist.*, 168 P.3d at 96 (alteration in the original) (quoting *Wis. Knife Works v. Nat. Meta Crafters*, 781 F.2d 1280, 1289 (7th Cir. 1986)).

[58] ECF No. 47 at 9 n.5 (collecting California authorities).

[59] ECF No. 47 at 9 (citing *Helle v. Core Home Health Servs. of Nev., Inc.*, 238 P.3d 818 (Nev. 2008 (unpublished) (discussing causation in context of claims for negligence and negligent training and supervision); *Johnson v. Egtedar*, 915 P.2d 271 (Nev. 1996) (discussing causation in context of claims for battery and medical malpractice); *Wyeth v. Rowatt*, 244 P.3d 765 (Nev. 2010) (discussing causation in context of claims for personal injury and strict products liability); *Holcomb v. Georgia Pacific, LLC*, 289 P.3d 188 (Nev. 2012) (adopting a specific causation standard for asbestos-induced mesothelioma cases); *Thompson v. TRW Automotive, Inc.*, 2:09-cv-1375-JAD-PAL, 2015 WL 5474448 (D. Nev. Sept. 17, 2015) (applying substantial-factor test in product-liability case)).

[60] *Id.* at 8 (citing Nev. J.I. 4.05).

contends "that WaMu would <u>not</u> have authorized Nevada Title to close the Loan if WaMu had known, prior to closing, that third parties were to receive $1,200,000 in proceeds at closing?"[61] The FDIC responded by objecting, incorrectly, that Nevada Title had the wrong test but ultimately answered "Yes."[62]  Nevada Title followed up by asking the FDIC to identify all facts, documents, and witnesses that support this contention.[63]  The FDIC responded that the large payment to parties who were not "otherwise parties to the transaction is a potential indicator of fraud and/or wrongdoing[,]" and it directed Nevada Title to Patricia Watanabe, who was WAMU's loan coordinator on this transaction.[64]  This persuades me that the FDIC can put on evidence to show that WAMU would not have been damaged but for Nevada Title's breach. Thus, Nevada Title is not entitled to summary judgment due to the lack of evidence to establish causation under the proper test.

### c.     The FDIC has not judicially admitted in this case that a different entity's breach is the but-for cause of WAMU's damages.

Nevada Title argues that the FDIC cannot establish causation because it judicially admitted that another entity is the but-for cause of WAMU's damages.  Nevada Title is referencing the third amended complaint that the FDIC filed in its action against LSI Appraisal, LLC, which appraised a host of properties for WAMU including the one in this transaction.  The FDIC alleges in its pleading in that action that, "[b]ut for the inflated values in the appraisal services provided by LSI, WaMu would not have made the residential mortgage loans at issue and would not have suffered losses on those loans."[65]  Although "[a]llegations in a complaint are

---

[61] ECF No. 47-14 at 8 (Interrogatory No. 9).

[62] *Id.* at 8–9 (Answer to Interrogatory No. 9).

[63] *Id.* at 9 (Interrogatory No. 10).

[64] *Id.* (Answer to Interrogatory No. 10).

[65] ECF No. 42-7 at 4, ¶ 4.

1  considered judicial admissions[,]"[66] a party is conclusively bound by factual allegations in his or

2  her pleadings **only for purpose of the case in which the admissions are made**."[67]  Statements

3  that the FDIC made in other litigation are not binding judicial admissions in this case.

4      **2.    Damages**

5

6          *a.    The double-recovery doctrine does not preclude the FDIC from*
           *pursuing Nevada Title for damages.*

7          Nevada Title argues that the double-recovery doctrine precludes the FDIC from

8  recovering damages from Nevada Title because the FDIC was fully compensated for WAMU's

9  injuries through the FDIC's $30 million settlement with LSI.  Nevada has expressly adopted the

10 double-recovery doctrine.[68]  Under that doctrine, "a plaintiff can recover only once for a single

11 injury even if the plaintiff asserts multiple legal theories.  Thus, satisfaction of the plaintiff's

12 damages for an injury bars further recovery for that injury."[69]  The doctrine applies when the total

13 recoverable damages have been established through judgment, order, or agreement, and the

14 settlement completely satisfies that amount.[70]

15         Nevada Title has not demonstrated that the doctrine should apply here.  It does not point

16 to any judgment, order, or agreement establishing what WAMU's total recoverable damages are

17 for the loan at issue in this case.  And it is not clear what amount of the $30 million settlement

18 was apportioned to cover the damages that WAMU allegedly suffered for this loan.  The FDIC-

19

20

21

22 [66] *Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008) (citing *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)).

23

24 [67] *BNSF Ry. Co. v. O'Dea*, 572, F.3d 785, 788 n.4 (9th Cir. 2009) (emphasis added); *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elec. Corp.*, 518 F.2d 913, 932 n.71 (9th Cir. 1975), *disapproved on other grounds by Cal. v. A. Stores Co.*, 495 U.S. 271 (1990).

25

26 [68] *Elyousef v. O'Reilly & Ferrario, LLC*, 245 P.3d 547, 549 (Nev. 2010).

27 [69] *Id.*

28 [70] *Id.*

LSI settlement resolved claims over 220 loans for damages claimed in excess of $154 million.[71] Accordingly, Nevada Title has not shown that the FDIC is barred from seeking damages for WAMU's alleged injuries in this action.

### b.    The FDIC is not precluded from offering damages evidence.

Nevada Title argues that the FDIC should be precluded from offering any evidence of WAMU's damages under FRCP 37(c) because the FDIC failed to produce documents supporting its damage calculation.[72]  The FDIC's damages are partly derived from the "book value" of the loan when it was acquired by JPMorgan on September 25, 2008.  The book value is determined, in part, by the charge-offs and write-downs that WAMU made on the loan.  Nevada Title complains that the FDIC has provided the bare, unauthenticated charge-off figures, but no documents supporting them.[73]  The FDIC responds by listing the evidence and discovery responses that it provided to explain its damage calculation.[74]  Most notably, the FDIC produced Jamie Thomas as its FRCP 30(b)(6) witness to answer Nevada Title's questions on the issue of damages including "the methodology utilized for determining the book value[ ] and documents supporting the valuation."[75]

Nevada Title presumes but does not demonstrate that there should be more documents to support the FDIC's damage calculation.  It did not address the fact that the FDIC produced an FRCP 30(b)(6) witness to testify on this issue.  Nor does it argue that this witness lacked knowledge on the subject or was evasive.  That Nevada Title wanted documents but got witness testimony instead does not necessarily mean that the FDIC failed to disclose something.  I will not preclude the FDIC from offering damages evidence based on this record.

---

[71] *See* ECF No. 42-7 at 1–29.

[72] ECF No. 42 at 22–26.

[73] *Id.*

[74] ECF No. 47 at 13–16.

[75] ECF No. 47-15.

1
2
3
4
5
6
7
8
9
10
11

### 3.    Breach

The FDIC argues that Nevada Title breached WAMU's closing instructions by: (1) providing an estimated HUD-1 statement that omitted material information; (2) failing to notify WAMU that mortgage broker MVP Financial and third parties Credit Associates, Terry Wood, and Brasameri were involved in the transaction; and (3) closing the transaction and disbursing loan funds despite involvement of the undisclosed-to-WAMU mortgage broker and other third parties.[76]  Nevada Title responds that summary judgment cannot issue on the last three alleged breaches because the closing instructions are ambiguous as to the meaning of third-party involvement.[77]  It further argues that MVP Financial was not involved in this transaction as a mortgage broker,[78] and, finally, that any alleged breach was minor, not material.[79]  I address Nevada Title's arguments in order, weaving in the FDIC's arguments along the way.

12

#### a.    *The closing instructions are not ambiguous.*

13
14
15
16
17

Nevada Title argues that it did not breach the closing instructions when it closed the transaction and paid Credit Associates, Terry Wood, and Brasameri—despite failing to inform WAMU about those parties and payments until after the fact—because the instructions are ambiguous about what "any Mortgage Broker or other third party involvement in this transaction" means.  The closing instructions provide that the:

18
19
20
21

> Lender is not aware of any Mortgage Broker or other third party involvement in this transaction.  If a Mortgage Broker or third party is involved, <u>do not close this transaction</u>.  Immediately return any final loan documents and funds that Lender has provided, and notify Lender of any broker and third party charges.  Lender will redraw final loan documents and/or provide new Lender's Closing Instructions.[80]

22
23
24
25
26
27
28

---

[76] ECF No. 41 at 11–12.

[77] ECF No. 48 at 15–17.

[78] *Id.* at 12–15.

[79] *Id.* at 17–18.

[80] ECF No. 41-1 at 17.

It appears that the escrow officer signed an additional document stating that WAMU "has not authorized any Retail Broker fee or Third Party fee in this transaction.  Settlement Agent is not authorized to pay any fees to a Broker or Third Party."[81]  This document seeks the escrow officer's "assurance" that this is understood, and states that WAMU "will not fund this loan unless" the document is signed and returned to [WAMU]".[82]

"'[I]n the absence of ambiguity or other factual complexities,' contract interpretation presents a question of law that the district court may decide on summary judgment . . . ."[83] "Whether a contract is ambiguous likewise presents a question of law."[84]  "The objective in interpreting contracts "is to discern the intent of the contracting parties.  Traditional rules of contract interpretation are employed to accomplish that result.'"[85]  The first step is to determine whether the "'language of the contract is clear and unambiguous; if it is, the contract will be enforced as written.'"[86]  "An ambiguous contract is susceptible to more than one reasonable interpretation, and '[a]ny ambiguity, moreover, should be construed against the drafter.'"[87] "[B]ut ambiguity does not arise simply because the parties disagree on how to interpret their

---

[81] *Id.* at 32.

[82] *Id.*

[83] *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013) (alteration in original) (quoting *Ellison v. Cal. St. Auto. Ass'n*, 797 P.2d 975, 97 (Nev. 1990)).

[84] *Id.*

[85] *Am. First. Fed. Credit Union v. Soro*, 359 P.3d 105, 106 (Nev. 2015) (quoting *Davis v. Beling*, 278 P.3d 501, 515 (Nev. 2012)).

[86] *Id.* (quoting *Davis*, 278 P.3d at 515).

[87] *Id.* (quoting *Anuvi, LLC v. G.L. Dragon, LLC*, 163 P.3d 405, 407 (Nev. 2007)).

1  contract."[88]  "Rather, an ambiguous contract is an agreement obscure in meaning, through

2  indefiniteness of expression, or having a double meaning."[89]

3       I find that the closing instructions are clear and unambiguous.  They state that WAMU is

4  not aware that a mortgage broker or other third party is involved in the transaction.  If Nevada

5  Title became aware that a mortgage broker or other third party was involved in the transaction,

6  the instructions required Nevada Title not to close escrow or disburse funds and to instead inform

7  WAMU, return the loan funds and loan documents to WAMU, and wait for further instruction

8  from WAMU.  The instructions explain what is meant by a broker or other third party being

9  "involved:" when brokers or other third parties have "charges" (i.e., request or demand for

10  payment)[90] against the funds in escrow.  What is meant by "third party" can be inferred from the

11  context of the agreement: any person or entity other than the buyer, seller, lender, or settlement

12  agent.  And there is no indiction that the parties meant "mortgage broker" to have anything other

13  than the plain meaning: "[a]n individual or organization that markets mortgage loans and brings

14  lenders and buyers together."[91]

15       Attempting to inject ambiguity into this agreement, Nevada Title argues that it is a

16  standard in this industry that an individual or entity who receives a portion of the seller's

17  proceeds is not considered a third party that is involved in the transaction.  Nevada Title points

18  me to its expert's testimony that such payments are not considered settlement charges and, thus,

19  are not required to be included on the HUD-1 statement.[92]  It also notes the FDIC's expert's

20

21

22  [88] *Galardi*, 301 P.3d at 366.

23  [89] *Id.* (quotation marks and quoted authorities omitted).

24  [90] *See Merriam-Webster's Collegiate Dictionary* 208 (11th ed. 2003) (defining the noun *charge*
25  as "the price demanded for something"); *accord Black's Law Dictionary* 282 (Bryan A. Garner
26  ed., 10th ed, Thompson Reuters 2014).  There are other uses for the word, but this is the proper
use given the context in which it is used.

27  [91] *Black's* at 233; *accord Webster's* at 157.

28  [92] ECF No. 48-6 at 2–8.

testimony that "there's a huge ambiguity in terms of 'or other third-party involvement' as that term is used in the Closing Instructions."[93]  It additionally relies on the escrow officer's testimony that she "probably [would] not" have informed WAMU had she received an addendum to the purchase agreement stating that the seller was paying Credit Associates a procreation fee of $1.2 million because "it involved how the seller's proceeds were being disbursed."[94]

"Modernly, courts consult trade usage and custom not only to determine the meaning of an ambiguous provision, but also to determine whether a contract provision is ambiguous in the first place."[95]  Under Nevada law, "'[a]mbiguity is not required before evidence of trade usage . . . can be used to ascertain' or illuminate contract terms."[96]  "Ordinarily, '[t]he existence and scope of a usage of trade are to be determined as questions of fact."[97]  "Summary judgment may be granted in a case requiring interpretation of an integrated written contract, if supported by admissible evidence of trade usage that is both 'persuasive' and 'unrebutted.'"[98]

Nevada Title's trade-usage evidence does not convince me that the closing instructions are ambiguous.  The snippets of expert and escrow-officer testimony that Nevada Title provides are in a vacuum and are not sufficient for me to find that a trade use or custom exists about the phrase "third party involvement."  I do not find this evidence useful to determine whether the closing instructions are ambiguous.  And I cannot conclude as a matter of law from this evidence that it is the custom in this trade that the phrase "other third parties" does not include, as Nevada

---

[93] ECF No. 48-7 at 2–6.

[94] ECF No. 48-5 at 4.

[95] *Id.* at 367.

[96] *Id.* (alteration in original) (quoting *Puget Sound Fin., LLC v. Unisearch, Inc.*, 47 P.3d 940, 943 (Wash. 2002)).

[97] *Id.* (alteration in original) (quoting Restatement (Second) of Contracts § 222(2) (1981)).

[98] *Id.* (quoting *Puget Sound Fin., LLC*, 47 P.3d at 943).

Title argues, individuals or entities who are paid by the escrow officer from funds in escrow that are earmarked as the seller's proceeds.

### b.   Alleged breach of providing a false estimated HUD-1 statement

The FDIC argues that Nevada Title breached the closing instructions by providing WAMU with an estimated HUD-1 statement wherein Nevada Title omitted information material to WAMU's decision to fund the loan—involvement of alleged mortgage broker MVP Financial and third parties Credit Associates, Terry Wood, and Brasameri. But when Nevada Title knew that Credit Associates, Terry Wood, and Brasameri were involved in this transaction in relation to when it provided the estimated HUD-1 statement to WAMU has not been established. The escrow officer declares that she received information "after initially preparing the Estimated HUD-1" that the balance of the seller's proceeds were to go to Credit Associates, Terry Wood, and Brasameri.[99] What is not clear is whether she received that information after preparing **and sending** the estimated HUD-1 statement to WAMU. Thus, the FDIC is not entitled to summary judgment on the issue of whether Nevada Title breached the closing instructions by sending a false estimated HUD-1 statement to WAMU.

### c.   Alleged breaches regarding MVP Financial's involvement

Whether MVP Financial was actually involved in this loan transaction as a mortgage broker or third party is genuinely disputed. The escrow officer declared in October 2014 that she was aware that MVP Financial was involved in the transaction, she understood it to be a mortgage broker or loan originator, and that it was acting in one of those capacities in the transaction.[100] But when the officer was deposed in this action nearly nine months later, she could not recall whether MVP Financial had served as a mortgage broker in the transaction.[101] Michael Chalmers, an independent contractor who worked as a loan officer for MVP Financial during the time that this transaction took place, declared that MVP Financial brokered this

---

[99] ECF No. 41-1 at 12, ¶ 9.

[100] ECF 41-1 at 13, ¶¶ 15–16.

[101] ECF No. 48-5 at 3 (76:07–14 of the transcript).

18

mortgage loan.[102]  But Mr. Chalmers inconsistently says in the same declaration that "At no point in time did I ever have any communications with [WAMU] about the mortgage loan transaction for 1590 Villa Rica Drive, nor am I aware of anyone at MVP Financial or anyone anywhere having communications with [WAMU] about the mortgage loan transaction for 1590 Villa Rica Drive."[103]  Additionally, the FDIC has not identified any admissible evidence showing that MVP Financial was paid from the funds in escrow.[104]

### d.    Alleged breaches regarding involvement of Credit Associates, Terry Wood, and Brasameri

The FDIC argues that Nevada Title breached the closing instructions when it (1) failed to inform WAMU about the involvement of Credit Associates, Terry Wood, and Brasameri and (2) disbursed funds to those third parties from escrow.  It is not genuinely disputed that Nevada Title was aware that Credit Associates, Terry Wood, and Brasameri were to be paid from the funds in escrow.[105]  That Nevada Title did not stop the transaction, inform WAMU of these third parties and the payments they were to receive, and return the funds and final loan documents to WAMU is also not disputed.[106]  The undisputed evidence instead shows that Nevada Title paid from escrow: (a) $300,000 to a bank account associated with an entity named Credit Associates; (b) $650,000 to a bank account associated with a person named Terry Wood; and (c) $250,000 to a bank account associated with an entity named Brasameri.[107]  It also shows that Nevada Title prepared and sent a final HUD-1 statement to WAMU after the transaction closed stating that an

---

[102] ECF No. 41-2 at 54, ¶ 5.

[103] *Id.* at 55, ¶ 8.

[104] I do not find that the lack of evidence on this point determines the issue because I get a sense from the record that there is further evidence of MVP Financial's involvement that the parties simply did not highlight in their summary-judgment briefing.

[105] *See e.g.* ECF No. 41-1 at 12, ¶¶ 8–11.

[106] *Id.* at 12–14, ¶¶ 12–13, 18.

[107] *Id.* at 12, ¶¶ 10–11.

1   "Additional Settlement Charge" in the amount of $1,200,000 was paid as a "Commission to

2   Credit Associates."[108]

3          But despite all this undisputed evidence, the FDIC is not entitled to summary judgment

4   on the issue of breach because it has not demonstrated that these breaches were material.  "[A]

5   'material breach' is a failure to do something that is so fundamental to a contract that the failure

6   to perform that obligation defeats the essential purpose of the contract . . . ."[109]  Whether a breach

7   is material is generally a question of fact.[110]  The FDIC asks me to find that these breaches were

8   material based on the bare language of the closing instructions and that it later discovered that

9   this transaction was part of a fraudulent scheme.  It has not identified any evidence that Nevada

10  Title's failure to convey this information before closing was important in the closing process, the

11  mortgage process, or to WAMU's decision to lend Mitchell money to purchase this house.

12  Determining that a breach is material "depends on the nature and effect of the violation in light of

13  how the particular contract was viewed, bargained for, entered into, and performed by the

14  parties."[111]  This is a fact-intensive inquiry that requires more than plain contract language and

15  one I cannot conduct on the the that the parties have presented to me.

16                                          **Conclusion**

17          Accordingly, IT IS HEREBY ORDERED that the FDIC's motion for summary judgment

18  **[ECF No. 41]** and Nevada Title's motion for summary judgment **[ECF No. 42]** are **DENIED**.

19  Nevada Title's evidentiary objections are **OVERRULED**.  Nevada Title's request for judicial

20  notice is **GRANTED** in part: I take judicial notice of the authenticity, publication, and existence

21  of the 19 documents identified by Nevada Title, but I do not take notice of the truth of their

22  contents.

23  ――――――――――――――

24  [108] *Id.* at 28, 30.

25  [109] *Williston on Contracts* § 63:3 (May 2016).

26  [110] *Thornton v. Agassiz Const. Inc.*, 799 P.2d 1106, 1108 (Nev. 1990).

27  [111] *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1020 n.37 (Nev. 2004)
28  (quoting *Stone Forest Indust., Inc. v. U.S.*, 973 F.2d 1548, 1550–51 (Fed. Cir. 1992)).

1    IT IS FURTHER ORDERED **that this case is referred to the magistrate judge for a**

2    **mandatory settlement conference.**

3    DATED: March 30, 2017.

4                                                    _____

5                                                    Jennifer A. Dorsey
                                                     United States District Judge

21